UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOSEPH FALZONE, on behalf of himself and all others similarly situated,<br><br>            Plaintiff,<br><br>v.<br><br>GENESCO INC., and HAL N. PENNINGTON,<br><br>            Defendants. | Civil Action No.<br>**07 CV 11146**<br><br>CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br>JURY TRIAL DEMANDED |

*[Received stamp: DEC 11 2007, U.S.D.C. S.D.N.Y. CASHIERS]*

Plaintiff, individually and on behalf of all others similarly situated, by his attorneys, alleges the following based upon the investigation of his counsel, except as to allegations specifically pertaining to plaintiff and his counsel, which are based on personal knowledge. The investigation of counsel is predicated upon, among other things, a review of public filings by Genesco Inc. ("Genesco" or the "Company") with the United States Securities and Exchange Commission ("SEC"), press releases issued by the Company, media reports about the Company, publicly available trading data relating to the price and volume of Genesco's common stock and a review of reports issued by analysts who follow Genesco.

## NATURE OF THE ACTION

1.     Plaintiff brings this action as a class action on behalf of himself and all other persons or entities who purchased Genesco securities on the open market, other than defendants and certain related persons and entities, during the period May 31, 2007 through November 16, 2007 (the "Class" and "Class Period," respectively), to recover damages caused to the Class by defendants' violations of the federal securities laws.

2.     Plaintiff alleges in this action that during the Class Period, defendants knowingly misrepresented Genesco's prospects and financial results by touting the Company's strong projected revenue and earnings, and thereby inducing Finish Line Inc. ("Finish Line") to enter into a merger agreement to acquire Genesco for $54.50 per share. The Company, however, failed

1

to disclose that its projected financial results were false and the Company made material misrepresentations to induce Finish Line to make an offer to purchase the Company.

3.   Defendants' fraud was revealed to the market on November 16, 2007, after the media reported that UBS Loan Finance LLC and UBS Securities LLC (collectively "UBS"), alleged that Genesco committed fraud in connection with Genesco's merger with Finish Line. Finish Line also alleged in a lawsuit that Genesco made material intentional misrepresentations to induce Finish Line to enter into a merger agreement with Genesco. On this news, Genesco's shares plummeted 23.5%, falling from $39.23 to $29.98. The decline in Genesco's stock price is a direct result of the nature and extent of defendants' false statements being revealed to investors and the market. The crash of the Company's stock price caused significant harm to Plaintiff and Genesco's other public shareholders.

## JURISDICTION AND VENUE

4.   This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §78aa and 28 U.S.C. §1331. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, as amended, §78j(b) and §78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder by the SEC.

5.   Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. §1391(b). Many of the acts and transactions giving rise to the violations of law complained of herein occurred in this District, and a lawsuit filed by UBS against Finish Line and Genesco, seeking an order to relieve UBS of its financing commitment to Finish Line in connection with the merger with Genesco, is currently pending in this District. In addition, the U.S. Attorney for the Southern District of New York is investigating Genesco for possible violations of federal fraud statutes and has issued a subpoena to Genesco for documents related to its merger with Finish Line.

## THE PARTIES

6.   As set forth in the attached Certification, plaintiff purchased the common stock of

Genesco during the Class Period at artificially inflated prices and was damaged thereby.

7.      Defendant Genesco is a Tennessee corporation with its principal executive offices located at 1415 Murfreesboro Road, Nashville, Tennessee 37217-2895. Genesco, a specialty retailer, sells footwear, headwear and accessories in more than 2,150 retail stores in the United States and Canada. At all relevant times, Genesco's common stock actively traded on the New York Stock Exchange under the symbol "GCO."

8.      Defendant Hal N. Pennington ("Pennington") currently serves as the Chairman and Chief Executive Officer of Genesco. Pennington became a member of the Company's board of directors (the "Board") in November 1999, when he was named executive vice president and chief operating officer. He became president of the Company in 2000, was named chief executive officer in April 2002 and chairman in 2004.

9.      By virtue of his position at Genesco, Pennington had access to the adverse and undisclosed information about the operating results and financial condition of the Company. He directly participated in the management of Genesco, was directly involved in the operations of Genesco at the highest levels, including devising, knowing of, or recklessly ignoring the material misrepresentations Genesco made to Finish Line, was privy to information concerning the operating results and financial condition of the Company, and was involved in the dissemination of the materially false and misleading statements and information alleged herein.

10.     By reason of his position as the senior most executive officer and a director of Genesco, Pennington was at all relevant times a controlling person within the meaning of Section 20 of the Exchange Act. Because of his executive and directorial position at Genesco, Pennington had access to adverse, non-public and specific information about the Company's operating results and financial condition. Further, as particularized herein, Pennington was able to and did control the contents of various reports and public statements regarding Genesco and its operating results and financial condition. Any acts attributed to Genesco were caused and/or influenced by Pennington by virtue of his controlling-person position at the Company.

11.     As the senior officer and a director of a publicly-held company whose common

stock was, at all relevant times, registered with the SEC pursuant to the Exchange Act, traded on the New York Stock Exchange, and governed by the provisions of the federal securities laws, Pennington had a duty to promptly disseminate accurate and truthful information about Genesco's operating results and condition, so that the market price of Genesco's publicly-traded securities would be based upon truthful and accurate information. Pennington's misrepresentations and omissions during the Class Period violated these specific requirements and obligations. By virtue of his positions of control and authority at Genesco, Pennington had the power to and did control the content of the various public statements concerning Genesco and its operating results and condition during the Class Period and indeed made many of the challenged statements described herein. Accordingly, Pennington was responsible for the accuracy of the public statements and releases detailed herein and is primarily liable for the misrepresentations contained therein.

## SUBSTANTIVE ALLEGATIONS

### Background

12. On April 20, 2007, Foot Locker Inc. ("Foot Locker") offered to buy Genesco for $46 per share. Genesco's shares rose from a close of $43.41 on April 19, 2007, to close at $49.98 on April 20, 2007, a 15% increase.

13. On April 23, 2007, Genesco rejected Foot Locker's offer. Defendant Pennington said in a statement "Our board unanimously rejected the proposal and concluded that it did not reflect the long-term value of Genesco, including its strong market position and future growth prospects." Genesco's stock went up from $49.98 to close at $50.56 after this announcement.

14. On May 17, 2007, Genesco Inc. issued a press release announcing a plan to close or convert 57 retail stores and revisions to its previously announced guidance for the quarter ended May 5, 2007. Due to the costs associated with the store closings, the Foot Locker bid, and other items, the Company revised its earnings guidance for the first quarter ended May 5, 2007:

> The Company said it now expects to report earnings in the range of $0.09 to $0.12 per diluted share for the quarter compared to the original guidance of $0.28 per share. The revised guidance reflects an expected shortfall of $0.01 to $0.02 per share related to operating

performance compared to the original guidance, asset impairment charges of $0.14 to $0.16 per share and approximately $0.01 per share of incremental income tax expense and unplanned costs incurred in connection with the Foot Locker proposal.

<div align="center">***</div>

The Company said that it expects to report same store sales growth of approximately 3% for the Journeys Group and 4% for Johnston & Murphy retail, and same store decreases of approximately -4% for the Hat World Group and -22% for the Underground Station Group for the quarter.

**Defendants' Materially False And Misleading Statements**

15. On May 31, 2007, Genesco issued a press release announcing its financial results for the first quarter ended May 5, 2007. In the press release, the Company stated in part:

> Genesco Inc. (NYSE: GCO) today reported earnings before discontinued operations of $2.2 million, or $0.10 per diluted share, for the first quarter ended May 5, 2007, including primarily non-cash, pretax fixed asset impairment charges of $6.6 million, or $0.15 per diluted share, primarily related to the Company's previously announced plan to close up to 57 underperforming stores in urban markets. For the quarter ended April 29, 2006, earnings before discontinued operations were $10.7 million, or $0.41 per diluted share. Net sales for the first quarter of fiscal 2008 increased 6% to $335 million, compared to $315 million for the first quarter of fiscal 2007.
>
> Genesco Chairman and Chief Executive Officer Hal N. Pennington said, "During the first quarter the Journeys Group posted solid sales growth and the positive momentum in the Johnston & Murphy and Dockers Footwear businesses continued. Hat World's business improved consistently throughout the quarter, with the successful transition to the new Major League Baseball on-field hat. However, the challenges in the urban market were once again a negative factor in our overall results for the quarter.
>
> "As we previously announced, we plan to close or convert up to 57 underperforming urban stores, primarily in the Underground Station Group, that have been most negatively impacted by the downturn in that market. We remain confident that Underground Station is a viable concept and believe that closing these stores will provide us with a stronger platform on which to rebuild and improve that business.

<div align="center">***</div>

> *The Company also updated its guidance for the fiscal year ending February 2, 2008. It now expects to report net sales of $1.59 billion and earnings per diluted share of $2.37 to $2.40 for fiscal 2008, including charges of $0.35 related to the store closing program.* The Company's fiscal 2008 guidance does not include the impact of any

costs associated with the Company's review of strategic alternatives, which the Company announced today.

(Emphasis added)

16. On June 18, 2007, the Company Filed a Form 8-K with the SEC, announcing that it entered into a merger agreement with Finish Line (the "Merger" or "Merger Agreement"), in which Finish Line would acquire all of the outstanding shares of Genesco's common stock for $54.50 per share. The Merger Agreement provided that each outstanding option to purchase Genesco common stock would be accelerated and coverted into the right to receive in cash equal to the product of (a) the excess of $54.50 over the exercise price per share of Common Stock for such option and (b) the number of shares of Common Stock then subject to such option. Additionally, the Merger Agreement provided that all restricted shares under the Company's equity plans would be vested in full immediately prior to the effective time of the Merger.

17. The Company also stated in the Form 8-K announcing the Merger that:

> Finish Line has obtained customary debt financing commitments for the transactions contemplated by the Merger Agreement, the aggregate proceeds of which are expected to be, when added with other sources of capital available to Finish Line, sufficient for Finish Line to pay the aggregate Merger consideration as well as all other fees and expenses associated with the transactions contemplated by the Merger Agreement.
>
> ***
>
> In connection with the proposed Merger, the Company will prepare a proxy statement for the shareholders of the Company to be filed with the Securities and Exchange Commission (the "SEC"). Before making any voting decision, the Company's shareholders are urged to read the proxy statement regarding the Merger and the related transactions carefully in its entirety when it becomes available because it will contain important information about the proposed transaction.

18. On, June 18, 2007, after the Merger was announced, Genesco's shares rose 7.8% from $49.60 to $53.75 on extremely high volume.

19. On July 11, 2007, Genesco filed its preliminary proxy with the SEC ("Preliminary Proxy"), providing Genesco shareholders with information to allow them to determine whether or not they should vote in favor of the Merger. Included in the Preliminary Proxy were two sets of projections, "Initial Projections" and "Update Projections." Genesco stated that the Initial

6

Projections were provided to the Company's financial advisor, Goldman, Sachs & Co., and the Company's Board, as Preliminary Projections, on, or near, April 20, 2007. At some time prior to May 29, 2007, the Company provided the Updated Projections to Finish Line, the Company's financial advisor, and the Board. Genesco stated in the Preliminary Proxy:

> The primary differences between the Initial Projections and the Updated Projections relate to the fact that actual results for the first fiscal quarter of 2007 were lower than management's earlier expectations and the Company's plan to close or convert up to 57 underperforming stores, primarily in the Underground Station Group, which plan had not been finalized at the time of the April 20 meeting of our board of directors.

20. The Updated Projections referred to above and provided to Finish Line stated as follows:

|  | Updated Projections | | | | |
|---|---|---|---|---|---|
|  | 2008E | 2009E | 2010E | 2011E | 2012E |
|  | | | (Dollars in millions) | | |
| Net Stores | 2,215 | 2,416 | 2,675 | 2,937 | 3,197 |
| Sales | $ 1,587 | $ 1,786 | $ 2,018 | $ 2,267 | $ 2,529 |
| EBIT (adjusted)(1) | $ 130 | $ 159 | $ 187 | $ 215 | $ 243 |

21. In discussing the ability of Finish Line to obtain financing to complete the Merger, the preliminary proxy stated:

> Debt Financing
>
> Debt Commitment Letter
>
> Finish Line has received a fully executed debt commitment letter (the "commitment letter") dated as of June 17, 2007, from UBS Loan Finance LLC ("UBS") and UBS Securities LLC ("UBSS"). Pursuant to the commitment letter, subject to the conditions set forth therein:
>
> • UBS has committed to provide to Finish Line up to $1.14 billion of senior secured credit facilities, for the purpose of financing the merger, repaying certain existing indebtedness of Finish Line, Genesco and their subsidiaries, paying fees and expenses incurred in connection with the merger and providing ongoing working capital requirements of Finish Line and its subsidiaries (including Genesco following the merger).
>
> • Finish Line is expected to issue and sell up to $700.0 million in

aggregate principal amount of debt securities. If the offering of debt securities by Finish Line is not completed substantially concurrently with the merger, UBS has committed to provide to Finish Line up to $700.0 million of a senior unsecured bridge facility, for the purpose of financing the merger, repaying or refinancing certain existing indebtedness of Finish Line, Genesco and their subsidiaries, paying fees and expenses incurred in connection with the merger and providing ongoing working capital and for other general corporate purposes of Finish Line and its subsidiaries.

The debt commitments expire on December 31, 2007. The documentation governing the senior secured credit facilities and the bridge loan facility has not been finalized and, accordingly, the actual terms of such facilities may differ from those described in this proxy statement.

Pursuant to the merger agreement, Finish Line is obligated to use its reasonable best efforts to obtain the debt financing set forth in the debt commitment letter at or prior to the closing of the merger. In the event that any portion of the debt financing becomes unavailable on the terms contemplated in the commitment letter, Finish Line must use its reasonable best efforts to arrange alternative financing from alternative sources on terms not materially less favorable to Finish Line in the aggregate (as determined in the good faith reasonable judgment of Finish Line).

Conditions Precedent to the Debt Commitments

***The availability of the senior secured credit facilities and the bridge loan facility is subject to***, among other things, there not having occurred since June 17, 2007 any change or condition that would constitute a company material adverse effect (as defined in the merger agreement), ***the accuracy in all material respects at the closing date of specified representations of Genesco in the merger agreement***, completion of the merger in accordance with the merger agreement in form and substance satisfactory to UBS and the negotiation, and execution and delivery of definitive documentation.

(Emphasis added)

22.  On August 13, 2007, Genesco filed with the SEC, and mailed to Genesco shareholders of record, the definitive proxy statement ("Definitive Proxy") notifying Genesco shareholders that the scheduled date to vote on the Merger was September 17, 2007. The Definitive Proxy contained much of the information provided in the Preliminary Proxy, including information as to the ability of Finish Line to obtain financing to complete the Merger and the statement by the Company that "The availability of the senior secured credit facilities and the bridge loan facility is subject to . . . the accuracy in all material respects at the closing date of

specified representations of Genesco in the merger agreement . . ." The Definitive Proxy also contained the Initial Projections and the Adjusted Projections.

23. The foregoing statements by the Company relating to the Merger and the projections for the year ending February 2, 2008, were false and misleading because the Company failed to disclose that it had not provided Finish Line or the investing public with material information in its possession relating to the Company's poor financial results for the second quarter ended August 4, 2007. In addition, the defendants knew or recklessly disregarded the fact that the Adjusted Projections were knowingly false projections that did not reflect the fact that Finish Line's business would suffer a substantial loss (and later had suffered a substantial loss) in earnings during the second quarter ended August 4, 2007.

**The Market Begins to Learn the Nature and Magnitude of the Wrongdoing**

24. Before the market opened on August 30, 2007, Genesco reported its second quarter ended August 4, 2007 financial results. Genesco reported a net loss of $4.2 million, or 19 cents a share, compared to a gain of $5.9 million or 24 cents a share for the same period the previous year. "Our second-quarter results were affected by the combination of a later start to back-to-school, later sales tax holidays in Texas and Florida and a generally challenging retail environment, especially in footwear," Genesco Chairman and Chief Executive Hal Pennington said in a statement. Later in the day, Finish Line issued a press release announcing it was disappointed with Genesco's financial results and was evaluating its options with respect to the merger. On this news, Genesco's shares fell from $50.10 to $41, on heavy volume, and closed at $44.95, a decline of 10.3% for the day.

25. On September 14, 2007, Finish Line issued a press release announcing that it received two letters from UBS. The press release stated that in the first letter, dated September 11, 2007, UBS stated, among other things:

> We hereby notify you that we reserve all rights with respect to our obligation to complete the financings as outlined under the commitment letter. While we will continue to pursue this matter in good faith, we are extremely concerned about the apparent deteriorating financial position of [Genesco]. We are continuing to actively monitor this situation, and look forward to your continued cooperation.

9

26.     The September 14, 2007 press release also stated that in the second letter from UBS, dated September 13, 2007, UBS stated in part:

> [O]ur agreement to perform under the Commitment Letter may be terminated if a Material Adverse Effect has occurred with respect to Genesco. As of today, we are not yet satisfied that Genesco has not experienced a Material Adverse Effect.
>
> ...
>
> Based on the foregoing, we ask that you cause Genesco and its representatives and advisors to provide all financial and other information that we request so that we may conclude whether a Material Adverse Effect has occurred. As part of that effort, we request that you cause Genesco to grant an expert retained by UBS unfettered access to Genesco's books and records and other financial information. In addition to the above steps, we expect your commercially reasonable efforts and active assistance to help us obtain the information we request. A list of additional requested information will follow under separate cover.
>
> As we have done to date, we will continue to work with you in an effort to prepare documents that may be needed for any potential closing. Please understand, however, that our efforts in doing so remain subject to a reservation of rights concerning any Material Adverse Effect. We also continue to reserve all other rights as referenced in our letter dated September 11, 2007.

27.     On September 19, 2007, Finish Line issued a press release announcing that it had received a request from UBS for additional financial and other information regarding Genesco, and had forwarded the request to Genesco.

28.     On September 19, 2007, Genesco issued a press release attaching a letter from defendant Pennington to Alan H. Cohen, Chairman of the Board and Chief Executive Officer of Finish Line, in which Pennington stated, amongst other things, that UBS' most recent request for information "comes within neither the spirit nor letter of our [merger] agreement" and demanded that Finish Line "immediately consummate the merger with Genesco."

29.     On September 21, 2007, Genesco announced that it filed a lawsuit in Chancery Court in Nashville, Tennessee, against Finish Line seeking an order requiring Finish Line to consummate its merger with Genesco and to require UBS to provide financing under the bank's commitment letter to Finish Line.

30.     On September 24, 2007, Finish Line issued a press release in which it stated that:

> The Finish Line has complied with its obligations under the merger

agreement, and as previously announced, continues to work on the closing documents. In that regard, The Finish Line has asked Genesco for certain financial and other information as well as access to Genesco's Chief Financial Officer and financial staff. However, to date Genesco has not responded to and has refused to comply with these requests. These failures constitute a breach of the merger agreement, and The Finish Line is today notifying Genesco of same.

We regret that Genesco has chosen to initiate litigation. We are reviewing the Genesco lawsuit and will take the necessary steps to protect the interests of The Finish Line and its shareholders.

We have no further comment at this time.

31. On November 15, 2007, UBS and Finish Line answered and filed counterclaims to Genesco's lawsuit. UBS claimed that Genesco fraudulently induced Finish Line to enter into the Merger Agreement. Finish Line claimed that Genesco intentionally, or negligently, misrepresented information to it, so to induce Finish Line to enter in to the Merger Agreement.

32. UBS' and Finish Line's counterclaims revealed that on May 24, 2007, Genesco provided Finish Line monthly projections for the year ending February 2, 2008, including projections for the month of May 2007. However, towards the end of May 2007, Genesco was aware that its actual financial results for May 2007 declined 180% from the prior year and 45% from the monthly performance that Genesco projected "only days before." On June 5, 2007 and June 14, 2007, Genesco falsely reaffirmed its May 24, 2007 projections provided to Finish Line, and based on Genesco's affirmative representations, Finish Line agreed to acquire Genesco for $54.50 per share, and UBS agreed to provide financing to Finish Line to complete the Merger.

33. On November 16, 2007, after the fraud and misrepresentation claims by UBS and Finish Line were reported by the media, Genesco's shares plummeted 23.5%, falling from $39.23 to $29.98. The decline in Genesco's stock price is a direct result of the nature and extent of defendants' false statements being revealed to investors and the market. The crash of the Company's stock price caused significant harm to Plaintiff and Genesco's other public shareholders.

34. The 23.5% stock drop is due solely to the unveiling of the fraudulent scheme whereby defendants allowed Genesco to improperly induce Finish Line to enter into the Merger Agreement.

35. On November 26, 2007, Genesco received a subpoena from the Office of the U.S. Attorney for the Southern District of New York seeking documents related to the Merger Agreement and in connection with alleged violations of federal fraud statutes. On this news, Genesco's stock plunged to $25.44 per share on November 27, 2007, on extremely high volume, almost a 16% drop from the closing price of $30.17 on November 26, 2007.

36. The loss suffered by the Plaintiff and other members of the Class was a direct result of Genesco and its management's fraudulent scheme to inflate its stock price for the benefit of Pennington.

## SCIENTER

37. Pennington, who directed the preparation and dissemination of the Company's public statements alleged to be false and misleading herein, was responsible for ascertaining that it was materially accurate. As detailed above, these public statements were materially false and misleading because, *inter alia*, the Merger Agreement entered into with Finish Line was entered into as a result of materially false misrepresentations by Genesco. Pennington knowingly engaged in the improper conduct alleged herein. As a result of this conduct, defendants knew that the Company's public statements were false. Pennington had access to all internal data concerning the Company's negotiations with Finish Line, and knew or recklessly disregarded information that the statements Genesco made in connection with the Merger to Finish Line and the market were false.

38. Pennington was directly responsible for negotiating the sale of the Company to Finish Line, and for providing Finish Line with accurate information. Pennington signed and reviewed Genesco's SEC filings containing the Company's financial projections, material omissions, and material false and misleading statements, as alleged herein.

39. Pennington was further motivated to artificially inflate the Company's stock price because he stood to gain millions of dollars through stock options, payments on restricted shares, and severance pursuant to the Merger Agreement. Specifically, Pennington, would have received $10.23 million for his stock options, $4.06 million for his restricted shares, and $5.57 million in severance, plus $1.98 million in tax reimbursements, when the deal closed. The Definitive Proxy


filed by Genesco on August 13, 2007, stated that it was anticipated that Pennington would not continue his role as chairman and chief executive officer of the surviving corporation following the Merger or otherwise in a formal capacity.

## CLASS ACTION ALLEGATIONS

40. Plaintiff brings this case as a class action pursuant to Rules 23 (a) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of himself and all other persons who purchased or otherwise acquired Genesco common stock between May 31, 2007 through November 16, 2007, inclusive. Excluded from the Class are defendants, any entities in which any of the defendants has a controlling interest, and the legal representatives, heirs, successors, affiliates or assigns of any of the foregoing excluded persons and entities.

41. This action is properly maintainable as a class action because:

   a. The members of the Class are so numerous that joinder of all members is impracticable. During the Class Period, about 22.7 million shares of Genesco common stock were outstanding and actively traded on the New York Stock Exchange. Upon information and belief, plaintiff believes that there are more than 1,000 members of the Class;

   b. Plaintiff's claims are typical of the claims of the other members of the Class, as plaintiff and the members of the Class purchased Genesco shares and sustained damages as a result of the defendants' wrongful conduct complained of herein;

   c. Plaintiff is a representative party who will fairly and adequately protect the interests of the other members of the Class and has retained counsel competent and experienced in class action securities litigation. Plaintiff has no interests antagonistic to, or in conflict with, the Class it seeks to represent;

d.  A class action is superior to other available methods for the fair and efficient adjudication of the claims asserted herein. As the damages suffered by the individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the Class members individually to redress the wrongs done to them. The likelihood of individual Class members prosecuting separate claims is remote;

e.  The questions of law and fact common to the members of the Class predominate over any questions affecting individual members of the Class. The questions of law and fact which are common to plaintiff and the Class include, among others:

   i.   whether the federal securities laws were violated by defendants' acts as alleged herein;

   ii.  whether statements disseminated to the investing public and to Genesco's common stock holders during the Class Period misrepresented material facts about the operating results and financial condition of the Company;

   iii. whether defendants acted with knowledge or with reckless disregard for the truth in misrepresenting and/or omitting to state material facts;

   iv.  whether, during the Class Period, the market price of Genesco common stock was artificially inflated due to the material misrepresentations and/or non-disclosures complained of herein;

   v.   whether the defendants participated in and pursued the common course of conduct complained of herein; and

   vi.  whether the members of the Class have sustained damages and, if so, what is the proper measure thereof;

42. Plaintiff anticipates no unusual difficulties in the management of this action as a

14

class action.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

43.   At all relevant times, the market for Genesco common stock was an efficient market for the following reasons, among others:

    a.   Genesco common stock met the requirements for listing, and was listed, on the New York Stock Exchange, an efficient and automated market;

    b.   During the Class Period, millions of shares of Genesco common stock were traded on the open market;

    c.   As a regulated issuer, Genesco filed periodic public reports with the SEC and the New York Stock Exchange; and

    d.   Genesco was followed by several securities analysts employed by brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms. These reports were publicly available and entered the public marketplace.

44.   As a result, the market for Genesco common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in Genesco's common stock price. Under these circumstances, all purchasers of the Company's common shares during the Class Period suffered similar injury through their purchase of shares at artificially inflated prices and a presumption of reliance applies.

## INAPPLICABILITY OF STATUTORY SAFE HARBOR

45.   The statutory safe harbor provided for forward-looking statements does not apply to any of the allegedly false statements pleaded in this Complaint. Defendants are liable for the false forward-looking statements alleged herein because at the time each of those forward-looking statements was made, the defendants had actual knowledge that the particular forward-looking statement was false.

46.   Moreover, the statutory safe harbor provided for forward-looking statements does not apply to false statements or material omissions of existing facts.

## COUNT I

### AGAINST ALL DEFENDANTS FOR VIOLATION OF SECTION 10(b) OF THE SECURITIES EXCHANGE ACT AND RULE 10b-5 THEREUNDER

47.  Plaintiff repeats and realleges each and every allegation above, as if set forth in full herein.

48.  Throughout the Class Period, defendants, individually and in concert, directly or indirectly, engaged in a common plan, scheme and course of conduct described herein, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and a course of business which operated as a fraud upon plaintiff and the other members of the Class; made various false statements of material facts and omitted to state material facts to make the statements made not misleading to plaintiff and the other members of the Class; and employed manipulative or deceptive devices and contrivances in connection with the purchase and sale of Genesco stock.

49.  The purpose and effect of defendants' plan, scheme and course of conduct were to artificially inflate the price of Genesco's stock and to artificially maintain the market price of Genesco securities.

50.  Pennington, who was a the top officer of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Genesco personnel to members of the investing public, including plaintiff and the Class, and the securities analysts.

51.  As a result of the foregoing, the market price of Genesco securities was artificially inflated during the Class Period. In ignorance of the falsity of the defendants' statements concerning the operating results and performance of Genesco, plaintiff and the other members of the Class relied, to their damage, on the statements described above and/or the integrity of the market price of Genesco stock during the Class Period in purchasing Genesco common stock at prices which were artificially inflated as a result of defendants' false and misleading statements.

52. Had plaintiff and the other members of the Class known of the material adverse information which defendants did not disclose, they would not have purchased Genesco common stock at the artificially inflated prices that they did.

53. Defendants' concealment of this material information served only to harm plaintiff and the other members of the Class who purchased Genesco common stock in ignorance of the financial risk to them as a result of such nondisclosures.

54. As a result of the wrongful conduct alleged herein, plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

55. By reason of the foregoing, defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and are liable to the plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of Genesco common stock during the Class Period.

## COUNT II

### AGAINST DEFENDANT PENNINGTON UNDER SECTION 20(A) FOR VIOLATIONS OF THE SECURITIES EXCHANGE ACT

56. Plaintiff repeats and realleges each and every allegation above, as if set forth in full herein.

57. During the Class Period, Pennington, by virtue of his office at, and directorship of Genesco and their specific acts, was a controlling person of Genesco within the meaning of Section 20(a) of the Exchange Act.

58. Pennington's position made him privy to, and provided him with actual knowledge of, the material facts which Pennington and Genesco concealed from plaintiff and the other members of the Class during the Class Period.

59. Pennington had the power and influence, and exercised same, to engage in the unlawful conduct and practices complained of herein by causing Genesco to disseminate the false and misleading information referred to above.

60. By virtue of the foregoing, Pennington has violated Section 20(a) of the Exchange Act.

61. By virtue of the conduct alleged above, Pennington is liable to the plaintiff and the other members of the Class for the substantial damages that they suffered in connection with their purchases of Genesco's common stock during the Class Period.

**WHEREFORE**, plaintiff, on his own behalf and on behalf of the other members of the Class, demands judgment against the defendants as follows:

A. Determining that this action is properly maintainable as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B. Certifying plaintiff as the Class Representative and his counsel as Class Counsel;

C. Declaring and determining that defendants violated the federal securities laws by reason of their conduct as alleged herein;

D. Awarding monetary damages against all defendants, jointly and severally, in favor of plaintiff and the other members of the Class for all losses and damages suffered as a result of the acts and transactions complained of herein, together with prejudgment interest from the date of the wrongs to the date of the judgment herein;

E. Awarding plaintiff the costs, expenses, and disbursements incurred in this action, including reasonable attorneys' and experts' fees; and

F.   Awarding plaintiff and the other members of the Class such other and further relief as the Court may deem just and proper in light of all the circumstances of this case.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: New York, New York
       December 10, 2007

                                        WOLF POPPER LLP

                                        _____
                                        Marian P. Rosner (MR-0410)
                                        Robert Finkel (RF-2373)
                                        Michael A. Schwartz (MS-2352)
                                        James Kelly-Kowlowitz (JK-9616)
                                        845 Third Avenue
                                        New York, New York  10022
                                        Tel.: 212-759-4600
                                        Fax:  212-486-2093

                                        Attorneys for Plaintiff

OF COUNSEL:

Jeffrey Squire
BRAGAR WEXLER & EAGEL, P.C.
885 Third Avenue
Suite 3040
New York, NY 10022
Tel: 212-308-5858
Fax: 212-486-0462

## PLAINTIFF CERTIFICATION

I, Joseph Falzone, hereby state:

1. I have reviewed the draft class action complaint against Genesco Inc. ("Genesco"), and certain of its senior officers and directors for violations of federal securities laws for knowingly making materially false statements in connection with the merger with Finish Line, Inc., and have authorized the filing of the complaint and/or a lead plaintiff motion on my behalf by Wolf Popper LLP.

2. I did not purchase the securities that are the subject of the action at the direction of counsel or in order to participate in this private action.

3. I am willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4. During the Class Period alleged in the Complaint, I made the following transactions in Genesco common stock:

| Transaction (Buy, Sell, etc.) | Trade Date | No. of Shares | Price Per Share |
|---|---|---|---|
| Buy | 9/12/07 | 1,000 | $46.46 |
| Sell | 9/14/07 | 424 | $44.27 |
| Sell | 9/14/07 | 76 | $44.30 |

5. During the three-year period preceding the date of my signing this certification, I have sought to serve, or have served, as representative on behalf of a class in the following private action(s) arising under the federal securities laws (if none, state "none"):

6. I will not accept any payment for serving as a representative party on behalf of a class except to receive my pro rata share of any recovery, or as ordered or approved by the Court, including the award to a representative party of reasonable costs and expenses including lost wages relating to the representation of the class.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 10 day of December 2007.

*/s/ Joseph Falzone*
SIGNATURE